# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

MICHAEL DAVIS,                    :
                                 :
            Plaintiff,           :
                                 :    Case No. 2:11-cv-164
        v.                       :
                                 :
STATE OF VERMONT,                :
DEPARTMENT OF CORRECTIONS,       :
                                 :
            Defendant.           :

## Memorandum Opinion and Order:
## Defendant's Motion to Dismiss

Plaintiff Michael Davis alleges that he was subjected to a hostile work environment based on sex, gender stereotyping, and disability, and that he was retaliated against when he complained of the harassment. Defendant DOC has filed a motion to dismiss all counts of Plaintiff's complaint pursuant to Rule 12(b)(6).

Before the Court are Defendant's Motion to Dismiss and Defendant's Supplemental Motion to Dismiss. For the reasons stated below, the Court grants Defendants Motion to Dismiss count seven alleging retaliation under the Americans With Disabilities Act ("ADA") and counts two, three, nine, and ten alleging sexual harassment on the basis of sex in violation of the Civil Rights Act of 1964 and the Vermont Fair Employment Practices Act ("VFEPA").

The Court denies Defendant's Motion to Dismiss counts four and eleven alleging harassment on the basis of gender stereotyping in violation of the Civil Rights Act of 1964 and the VFEPA; counts one and eight alleging harassment on the basis of disability in violation of the Rehabilitation Act and the VFEPA; and counts five, six, and twelve alleging retaliation in violation of the Civil Rights Act of 1964, the Rehabilitation Act, and the VFEPA.

**BACKGROUND**

For purposes of addressing a motion to dismiss, the Court accepts as true all allegations set forth in the Complaint. *Gregory v.* Daly, 243 F.3d 687, 691 (2d Cir. 2001). Plaintiff worked for the Vermont Department of Corrections ("DOC") as a guard from December 2005 until September 2010.

In December 2008, Davis missed two weeks of work due to pain that he was experiencing in his groin and testicles from a work-related injury. In January 2009, after he returned to work, he received from supervisors two offensive emails including objectionable photos referencing his groin. One of the emails contained a picture of an individual with his testicles showing with Davis's face superimposed on the individual. Staff received copies of these emails and inmates became aware of or saw them.

In February 2009, Davis had hernia surgery and was out of work for four weeks. While on leave, Davis complained of the emails and conduct to his union representative and sought treatment for emotional stress due to his supervisors' harassment. Defendant subsequently investigated his supervisors' behavior.

When he returned to work, Davis's co-workers and supervisors were unfriendly toward him. Two weeks after the conclusion of the investigation of his supervisors, Davis received an anonymous note in his work mailbox stating "How's your nuts / kill yourself / your done." In addition, several times a week inmates ridiculed Davis, grabbing their testicles, making comments such as "good luck making kids with that package," winking, and laughing. Davis reported these incidents but no investigation resulted.

Shortly after, a co-worker copied Davis on an email that included a cartoon of an individual with a gun to his head with the caption "kill yourself." In addition, inmate taunts continued after Davis was reassigned to a higher security area where inmates could only have become aware of Davis's medical condition from staff. Davis again filled out an incident report and complained about the inmate harassment, but defendant did not investigate or remediate the situation. In May 2009, a

doctor restricted Davis from working in his position due to the excessive anxiety related to the harassment.

In September 2009, Davis was injured at work during "use of force" training due to improper supervision of the training by one of the supervisors who had sent one of the offensive emails to Davis.  Davis went on worker's compensation leave for the resulting shoulder injury for over a year, at which time he received a medical reduction in force.  While on leave, Davis was followed by a private investigator, who Davis believes Defendant hired.

After receiving a right to sue notice from the Equal Employment Opportunity Commission ("EEOC"), Davis filed this suit in June 2011, bringing claims under the Civil Rights Act of 1964 and the ADA.  After Defendant filed its Motion to Dismiss in October, Plaintiff filed two amended complaints.  The Second Amended Complaint filed in December 2011 contains additional claims under the Rehabilitation Act and the VFEPA based on essentially on the same alleged facts as the original complaint. Defendant subsequently filed a Supplemental Motion to Dismiss, which extends its arguments related to the Civil Rights Act and the ADA to Plaintiff's claims under the Rehabilitation Act and the VFEPA.

**DISCUSSION**

## I.    Standard of Review

This Court recently articulated the standard for reviewing a motion to dismiss pursuant to Rule 12(b)(6):

In *Ashcroft v. Iqbal*, the Supreme Court set forth a "two-pronged" approach for analyzing a Rule 12(b)(6) motion to dismiss.  556 U.S. 662 (2009).  First, a court must accept a plaintiff's factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor.  This assumption of truth, however, does not apply to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.

Second, a court must determine whether the complaint's well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that the defendant acted unlawfully.

*Gadreault v. Grearson*, No. 2:11-cv-63, 2011 U.S. Dist. LEXIS
119391 (D. Vt. Oct. 14, 2011) (internal quotations and citations
omitted).

**II.    Eleventh Amendment Immunity**

In his original complaint, Plaintiff alleged violations of
the ADA pursuant to both Title I, prohibiting discrimination in
employment, and Title V, prohibiting retaliation.  Defendant
moved for dismissal of these claims, asserting that they are
barred by the Eleventh Amendment.  Plaintiff subsequently
voluntarily dropped his Title I claim, but continues with his
Title V claim in his Second Amended Complaint. Defendant's
briefing of the matter focuses on the Title I claim, although it
urges that the conclusion should extend to the Title V claim as
well.

The Eleventh Amendment bars a private suit against a state
and entities considered arms of the state unless the state
unequivocally consents to being sued or Congress "unequivocally
express[es] its intent" to abrogate the state's sovereign
immunity.  *In re Deposit Ins.* Agency, 482 F.3d 612, 617 (2d Cir.
2007) (quoting *Tennessee v. Lane*, 541 U.S. 509, 517 (2004));
*Clissuras v. City Univ. of N.Y.*, 359 F.3d 79, 81 (2d Cir. 2004).
It is clear that Title I claims against a state are barred by
the Eleventh Amendment.  *Board of Trustees of the Univ. of Ala.
v. Garrett*, 531 U.S. 356, 368 (2001).  As for Title V, the

6

district courts in the Second Circuit that have addressed the issue have all concluded that Title V claims are barred by the Eleventh Amendment. Until now, this issue has remained open in this district. *See Bain v.* Gorczyk, 2010 U.S. Dist. LEXIS 137825, *11 (Dist. Vt. Dec. 3, 2010). The Court resolves this issue, following the reasoning in *Chiesa v. N.Y. State Dept. of Labor* that, "[i]f a state is immune from underlying discrimination, then it follows that the state must be immune from claims alleging retaliation for protesting against discrimination." 638 F.Supp.2d 316, 323 (N.D.N.Y. 2009).

Title V of the ADA prohibits retaliation "against any individual because such individual has opposed any act or practice made unlawful by this Act . . ." 42 U.S.C. 12203(a). Here, Davis's ADA retaliation claim must be based on acts that are unlawful under Title I, the exclusive remedy for employment discrimination claims under the ADA, even when the employer is a public entity. *Emmons v. City University of NY*, 715 F.Supp.2d 394, 408 (E.D.N.Y. 2010). Because Defendant is immune from Plaintiff's underlying ADA claim of employment discrimination under Title I, it should likewise be immune to his Title V retaliation claim that is grounded in acts that are unlawful under Title I.

Accordingly, the Court grants Defendant's Motion and Supplemental Motion to Dismiss count seven of the Second Amended Complaint alleging a violation of Title V of the ADA.

### III.  Hostile Work Environment

Plaintiff alleges six counts of sexual harassment due to a hostile work environment, three in violation of Title VII of the Civil Rights Act of 1964 and three in violation of the VFEPA. Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. §2000e-2(a)(1).  Sexual harassment in the form of a hostile work environment constitutes sex discrimination. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64 (1986). "[V]FEPA is patterned on Title VII of the Civil Rights Act of 1964, and the standards and burdens of proof under [V]FEPA are identical to those under Title VII." *Hodgdon v. Mt. Mansfield Co., Inc.,* 160 Vt. 150, 624 A.2d 1122, 1128 (Vt. 1992).

Plaintiff also alleges two counts of discrimination due to a hostile work environment on the basis of disability, one count alleging violations of Section 504 of the Rehabilitation Act and one count alleging violations of the VFEPA.  The reach and standards applied to cases brought pursuant to the Rehabilitation Act are identical to those of the Americans with Disabilities Act.  *Weixel v. Bd. Of Educ. Of N.Y.,* 287 F.3d 138,

146 n.5 (2d Cir. 2002).  Courts analyze hostile work environment claims under the ADA, and therefore the Rehabilitation Act, using the same standard applied in Title VII hostile work environment claims. *Behringer v. Lavelle School for the Blind*, 2010 U.S. Dist. Lexis 134440 (S.D.N.Y. Dec. 17, 2010), *citing Schiano v. Quality Payroll Sys., Inc.* 445 F.3d 597, 609 (2d Cir. 2006). "[V]FEPA's handicap discrimination provisions are modeled on federal legislation, and therefore federal case law and regulations provide guidance in construing them." *Lowell v. IBM*, 955 F.Supp. 300 (Dist. Vt. 1997).

To maintain a claim of hostile work environment, Plaintiff must show that: (1) "he . . . was subjected to harassment because of his . . . membership in a protected class," (2) the harassment "was so severe or pervasive as to alter the conditions of his . . . employment," and (3) "there is a specific basis for imputing the harassment to the defendant." *Little v. Nat'l Broad. Co., Inc.,* 210 F.Supp.2d 330, 388 (S.D.N.Y. 2002)(citations omitted); *see also Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).

## A. Harassment Because of Membership in a Protected Class Under Title VII

Sexual harassment between individuals of the same sex is actionable under Title VII to the extent it occurs "because of" the plaintiff's sex. *Oncale v. Sundowner Offshore Services,* 523

U.S. 75, 79 (1998).  In *Oncale*, the Court explained three ways

in which a plaintiff in such a case can show harassment based on

sex:  the harasser (1) was motivated by sexual desire, (2) was

"motivated by general hostility to the presence" of males in the

workplace, or (3) treated members of the opposite sex

disparately.  *Id.* at 80-81.  These are nonexclusive evidentiary

routes that courts have recognized for proving that "conduct at

issue was not merely tinged with offensive sexual connotations,

but actually constituted '*discrimination* . . . because of . . .

sex.'"  *Id.* at 81.  A plaintiff can also sustain an allegation

of sex discrimination in violation of Title VII based on gender

stereotyping.  *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

Plaintiff claims that Defendant engaged in discrimination

in violation of Title VII by creating a hostile work environment

because of Plaintiff's male sex.  The hostile environment was

allegedly created in three ways:  (1) as a result of DOC

employee and inmate harassment motivated by sexual desire

(counts two under Title VII and nine under the VFEPA), (2)

through DOC employee and inmate use of sex-specific and

derogatory words as well as images focused on Plaintiff's male

sex organs (counts three and ten), and (3) based on Defendant's

and inmates' perception that Plaintiff failed to conform to male

gender stereotypes (counts four and eleven).

As to the first evidentiary route, Plaintiff has failed to plead any factual allegations that allow the Court to draw a reasonable inference that the alleged harassment was due to sexual desire. Neither the emails nor verbal comments made to Plaintiff suggest in any manner that Defendant's employees or the inmates were so motivated. Accordingly, the Court dismisses counts two and nine of the Second Amended Complaint.

As to the second evidentiary route, Defendant does not dispute the allegations that images sent to Plaintiff in emails referred to genitalia. Further, one may reasonably infer from the allegations that inmates grabbing their crotches were referring to Plaintiff's genitalia. One also can plausibly infer that these emails and the gestures were derogatory. Although the conduct may have been tinged with offensive sexual connotations, however, there is no support for the conclusion that they constituted discrimination because of sex. Contrary to Plaintiff's assertion, his allegations do not parallel any of the evidentiary routes described in *Oncale*, nor does Plaintiff suggest another evidentiary route that his facts support. No inference can be drawn from the alleged facts that the conduct was due to general hostility to the presence of males in the workplace or that they were due to disparate treatment of members of the opposite sex. For this reason, the Court dismisses counts three and ten of the Second Amended Complaint.

Plaintiff also claims that a hostile work environment was created based on harassing conduct that suggested Plaintiff failed to conform to gender stereotypes. "Just as a woman can ground an action on a claim that men discriminated against her because she did not meet stereotyped expectations of femininity, a man can ground a claim on evidence that other men discriminated against him because he did not meet stereotyped expectations of masculinity." *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 261 n. 4 (1st Cir. 1999) (citing *Price Waterhouse*, 490 U.S. at 250-51); *Bibby v. Philadelphia Coca Cola Bottling*, 260 F.3d 257, 264 (3d Cir. 2001).

The facts alleged allow the Court to reasonably infer that abuse directed at Plaintiff reflected the harassers' belief that he did not act in conformity with his co-workers' gender norms. Plaintiff alleges that his supervisor sent him an email stating "[w]ay to milk it buddy," referring to the time he took off due to his injury. Second Amended Complaint ¶ 21. This allegation provides a plausible basis for the inference that it went against expected masculine behavior at the DOC to seek medical treatment for, and take time off due to, a testicular injury. The inmate statement "good luck making kids with that package" (*id.* ¶ 38) also supports the reasonable inference that the abuse was motivated by a perception that Davis was not conforming to gender stereotypes at the DOC of how a man should act. The

Court concludes that these two specific allegations are sufficient at this stage of the case to support the allegations of counts four and eleven that Plaintiff was a member of a protected class under Title VII of the Civil Rights Act of 1964.

### B. Harassment Because of Membership in a Protected Class Under the Rehabilitation Act

The ADA defines "disability" as (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual," (2) "a record of such an impairment," or (3) "being regarded as having such an impairment." 42 U.S.C. §12102(1). The ADA Amendments Act of 2008 ("ADAAA") made it easier for plaintiffs to prove they are "disabled" under the ADA, providing that a disability "shall be construed in favor of broad coverage of individuals" and that a finding of disability "should not demand extensive analysis." 42 U.S.C. §12102(4)(A); 29 C.F.R. §1630.1(c)(4).

The first alternative of the definition of disability constitutes a finding of "actual disability." The post-ADAAA EEOC regulations provide that, to create a disability under this definition, an impairment need only "substantially limit[] the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity

in order to be considered substantially limiting." 29 C.F.R. §1630.2(j)(1)(ii). Further, "substantially limits" is "not meant to be a demanding standard" and "shall be construed broadly in favor of expansive coverage." 29 C.F.R. §1630.2(j), (k). "Major life activities" that must be substantially limited include, but are not limited to, "performing manual tasks, . . . reaching, lifting . . . and working" or "[t]he operation of major bodily function, including . . . reproductive functions." 29 C.F.R. §1630.2(i)(1)(i)-(iii).

In his Second Amended Complaint, Plaintiff alleges that, after he returned from work from a two-week medical leave and before he underwent hernia surgery, "[a]s a result of the ongoing medical problem involving his testicles, Mr. Davis was substantially limited in his abilities to, *inter alia*, engage in sexual intercourse, and to perform manual tasks such as lifting and pulling." Second Amended Complaint ¶ 15. Further, due to his impairment, Davis was "out of work for approximately four or more weeks." *Id.* ¶ 27. Although he does not specifically state the duration of the foregoing substantial limitations, from the face of the Second Amended Complaint it appears that they existed from at least December 2008 to March 2009, when Davis returned from hernia surgery. Plaintiff also alleges that, thereafter, due to the harassment, he suffered from emotional distress and excessive anxiety, *id.* ¶¶ 30, 34, 39, 48, 49, and

that he suffered from "ongoing intermittent genital pain," i*d.* ¶
56.  But he does not allege that these latter problems of
emotional distress, excessive anxiety or ongoing pain
substantially limited any major life activity.

Reading the Second Amended Complaint in a light most
favorable to Plaintiff, his allegations that he was unable to
perform manual tasks such as lifting and pulling or engage in
sexual intercourse are sufficient under the lenient standards of
the ADAAA to establish an actual disability.  In January 2009,
at the time Davis's supervisors sent the emails precipitating
the alleged hostile work environment, Davis met the definition
for having an actual disability as "a physical or mental
impairment that substantially limits one or more major life
activities of such individual."  42 U.S.C. §12102(1); 29 C.F.R.
§1630.2(j).  Plaintiff's allegations may not support a finding
that the limitation of a major life activity continued after
Davis's hernia surgery and return to work.  Nevertheless, the
initial harassing conduct focused on Davis's actual disability
and cascaded into a pattern of taunts, ridicule, and jibes from
co-workers and inmates that, left unchecked, constituted the
alleged ongoing hostile work environment.

Even if the actual disability ended while the harassment
continued, Davis could still show that he was a member of a
protected class due to disability under the second alternative

of the ADAAA definition of a disability: a record of an
impairment that substantially limits one or more of the
individual's major life activities. 29 C.F.R.
§§1630.2(g)(1)(ii), (k)(1). This provision is intended to
"ensure that people are not discriminated against because of a
history of disability." 29 C.F.R. Part 1630 Appendix; see
*Brandon v. O'Mara*, 2011 U.S. Dist. LEXIS 112314, *18 (S.D.N.Y.
Sept. 28, 2011); *Heneghan v. NY City Admin.*, 2006 U.S. Dist.
LEXIS 64849, *16 (E.D.N.Y. Sept. 11, 2006) ("Defendant is wrong
to the extent it suggests that since plaintiff no longer had a
disability at the time he applied for reinstatement, he cannot
state a claim under the ADA.").

Plaintiff does not specifically rely on this alternative
definition, nor has he explicitly pointed to records of the
impairment. Nevertheless, he has pled sufficient facts for the
Court to draw the reasonable inference that such records exist.
The Court can reasonably infer that employment or medical
records exist from Plaintiff's allegations related to his
medical absence from work in December 2008 (Second Amended
Complaint ¶ 13), his hernia surgery (*id.* ¶ 27), and his
complaint about emails that Defendant investigated (*id.* ¶¶ 29,
31). "[G]enerally a complaint that gives full notice of the
circumstances giving rise to the plaintiff's claim for relief
need not also correctly plead the legal theory or theories and

statutory basis supporting the claim." *Marbury Management, Inc.*
*v. Kohn*, 629 F.2d 705, 712 n.4 (2d Cir. 1980). Here,
Plaintiff's Second Amended Complaint gives sufficient notice of
the circumstances of his claim for relief to support the legal
theory that there is a record of an impairment for establishing
disability.

Plaintiff also alleges that he meets the third alternative
of the definition of disability – that he is "regarded as
having" an impairment. 29 C.F.R. §1630.2(g)(1)(iii). A person
can satisfy the "regarded as" definition of disability if he
"has been subjected to an actual or perceived physical or mental
impairment whether or not the impairment limits or is perceived
to limit a major life activity." 42 U.S.C. §12102(3)(A). Under
this alternative, the question is not about Plaintiff's actual
condition, but rather about how his employer perceived his
condition, including the "reactions and perceptions of the
persons interacting or working with him." *Estate of Murray v.
UHS of Fairmount, Inc.*, 2011 U.S. Dist. LEXIS 130199 (E.D. Pa
Nov. 9, 2011) (quoting *Kelly v. Drexel Univ.*, 94 F.3d 102, 108
(3d Cir. 1996).

Plaintiff asserts that the perception that he was impaired
is shown in the reactions of his supervisors, co-workers, and
the inmates related to his medical condition. Even though,
arguably, his employer no longer held that perception by May of

2009, when Davis was included in "use of force" training,
inmates appeared to continue to have this perception. Davis's
supervisors and co-workers had established this perception, and
it continued unabated among the inmates. The facts that
Plaintiff alleges plausibly support a conclusion that he was
regarded as having a disability.

Defendant argues that any perceived impairment was both
transitory and minor, which is a defense to an individual's
charge of discrimination based on coverage under the "regarded
as" alternative of the definition of disability. 29 C.F.R.
§1630.15(f). To defeat "regarded as" coverage, Defendant "must
demonstrate that the impairment is (in the case of an actual
impairment) or would be (in the case of a perceived impairment)
both transitory and minor. For purposes of this section,
'transitory' is defined as lasting six months or less." *Id.*; 42
U.S.C. §12102(3)(B). To the extent that this defense is
apparent from the face of the complaint, it would be an
appropriate basis for dismissing the claim that Plaintiff was
regarded as having an impairment. *Dube v. Texas Health and Human
Services*, 2011 U.S. Dist. LEXIS 99680, *12 (W.D. Tex. Sept. 6,
2011). Defendant has failed, however, to show on the basis of
the Second Amended Complaint alone that the perceived impairment
was transitory. Indeed, the allegations suggest that the
perceived impairment, if not the actual impairment, lasted

longer than six months.  The perception that Davis was impaired
started with Davis's supervisors in January and persisted
through the perceptions of the inmates until September, when
Davis left on workers compensation.  In addition, Defendant is
unable to show from the face of the Second Amended Complaint
that the impairment was minor.  Accordingly, Defendant at this
stage of the case cannot sustain the defense that the perceived
impairment is both transitory and minor.

The Court concludes that Plaintiff has pled sufficient
facts to support a reasonable inference that he is a member of a
protected class under the Rehabilitation Act and the VFEPA due
to his disability.

**C. Severe and Pervasive Harassment**

Plaintiff must also show that the harassment was
sufficiently severe or pervasive, which requires proof that
Plaintiff "*subjectively* perceived the environment to be abusive
[and] that the environment was *objectively* hostile and abusive."
*Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d. Cir. 2006)
(emphasis added).  Because there is no dispute that Davis
subjectively perceived his environment to be hostile and abusive,
the Court need only consider whether the environment was
objectively hostile.

To determine whether the employment environment was
"objectively hostile," Plaintiff must allege facts showing that

"the environment was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Little,* 210 F. Supp.2d at 388*.* "The Supreme Court has emphasized that the standard for judging whether a work environment is objectively hostile must be sufficiently demanding so as to prevent Title VII from becoming a general civility code." *Id. (citing Oncale*, 523 U.S. at 80). "Courts must distinguish between merely offensive and boorish conduct and conduct that is sufficiently severe or pervasive as to alter the conditions of employment." *Id.* (internal quotation marks omitted).

To determine if the environment was sufficiently hostile or abusive to violate Title VII or the ADA, the Court should consider "all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993); *see also Oncale,* 523 U.S. at 81-82 (The "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

The required level of seriousness or severity "varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir. 1991). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted). The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale*, 523 at 81.

Davis has sufficiently pled facts that would allow a reasonable inference that his supervisors' harassment and the inmates' more sustained and unchecked campaign of taunts directed at Davis and designed to humiliate or anger him was sufficiently severe and pervasive to alter the terms and conditions of his employment.

The alleged harassment commenced with two emails sent on consecutive days from Davis's supervisors. These emails contained explicit references to Plaintiff's genital pain. In and of themselves, the emails are likely insufficient to form the basis of Plaintiff's claim. But Plaintiff also alleges that these "emails were circulated to other staff, and were hung in the mail room where employees (both male and female), and

inmates could see them." Second Amended Complaint ¶ 24. Both coworkers and inmates became aware of the emails and of Davis's medical condition and the fact that he had taken time off due to his condition. *Id.* ¶¶ 24-26, 28, 36-37. One may reasonably infer that the distribution of these emails led to the ongoing harassment that Davis endured after he returned from hernia surgery.

After his return, Davis received a threating note in his mailbox that stated "How's your nuts / kill yourself / your done." *Id.* ¶ 33. Defendant asserts that there is no basis to conclude that this threatening note was from an employee of the Department of Corrections. But this is beside the point. The note supports the inference that Davis's supervisors had poisoned the atmosphere in which Davis worked by making his medical condition known and by giving the sense that it was acceptable to harass him due to that condition and due to his taking time off because of the condition. Three months later Davis was copied on an email containing a cartoon drawing of someone with a gun to his head with the caption "Kill Yourself." This email similarly supports an inference that Defendant had created a work environment hostile to Davis.

Although these particular communications were sporadic, they were sufficiently severe to alter the conditions of employment. The initial emails that were distributed within the

work place were humiliating. The latter "kill yourself" note
and email were physically threatening. The alleged facts
support the plausible inference that these communications were
"physically threating or humiliating [and not] mere offensive
utterance[s]." *Harris*, 510 U.S. at 23.

Moreover, Plaintiff's allegations of ongoing and frequent
inmate ridicule and insult allow the reasonable conclusion that
the harassment was also pervasive. Inmates became aware of
Davis's condition from the actions of Defendant's employees.
The inmate harassment can be directly attributed to Davis's
supervisors, who had sent the initial emails that were then
circulated in a manner such that the inmates became aware of
Davis's condition. Plaintiff alleges that inmates would
ridicule him on a regular basis by grabbing their testicles,
making comments such as "good luck making kids with that
package," and winking and laughing at him. Second Amended
Complaint ¶ 38. The inmate taunts continued after Davis was
transferred to a higher security area, where inmates could only
have become aware of Davis's medical condition from staff. *Id.*
¶¶ 42-43. Plaintiff alleges that the inmate harassment went on
for months. *Id.* ¶ 51.

Although the actual inmate taunts may not seem egregious in
themselves, Plaintiff sufficiently alleges that they were due to
his disability and to gender stereotyping and that they impacted

his ability to safely and effectively do his job.  ¶ 40.
Plaintiff also contends that the impact on his ability to do his
job was particularly adverse in the context of a correctional
facility, where "harassment could impair relationships needed in
life threatening circumstances."  Plf.'s Mem. at 18, *citing*
*Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000).

Defendant has a different take on the prison context of the
alleged harassment. It notes that "[c]ourts repeatedly decline
to impose sexual harassment liability upon correctional
institutions for the sexually offensive conduct of inmates," and
that "[i]t is absurd to expect that a prison can actually stop
all obscene comments and conduct from its inmates – people who
have been deemed unsuited to live in normal society."  Def.'s
Reply at 2, *quoting Powell v. Morris*, 37 F.Supp.2d 1011, 1017
(S.D. Ohio 1999).  Plaintiff has the better position at this
stage of the case.  The behavior of the inmates based on Davis's
medical condition and on gender stereotyping plausibly give rise
to an entitlement to relief as it is reasonable to infer that
they adversely affected his conditions of employment as a prison
guard.

Considering all of the circumstances, Davis's allegations
are sufficient to survive a motion to dismiss his claim that the
harassment was severe and pervasive.

**D. Defendant's Liability for the Harassment**

It is clear that Defendant can be held vicariously liable for harassment by a supervisor, subject to potential affirmative defenses that have not been advanced here. *See Faragher,* 524 U.S. at 780; *Drew v. Plaza Const. Corp.,* 688 F.Supp.2d 270, 280 (S.D.N.Y. 2010) ("When a supervisor participates in the conduct creating a hostile work environment, liability may be imputed to the employer.").

In this case, most of the conduct constituting the harassment is attributable to either co-workers (the "kill yourself" note and "kill yourself" email) or inmates. Notably, however, the conduct of the co-workers and inmates can be imputed to Davis's supervisors. It was they who initiated the ridicule, taunts, and derision constituting the severe and pervasive harassment. It is reasonable to infer that but for the initial offensive emails that they sent, which were circulated such that co-workers and inmates became aware of Davis's impairment and the time off he took due to his impairment, the hostile work environment would not have materialized.

In any event, it is well-established that employers may be held liable for harassment by third parties when that conduct creates a hostile work environment. See, e.g., *Beckford v.*

*Florida Dep't of Corr.,* 605 F.3d 951, 958 (11th Cir. 2010);

*Erickson v. Wis. Dep't of Corr.,* 469 F.3d 600, 605 (7th Cir.

2006); *Galdamez v. Potter,* 415 F.3d 1015, 1022 (9th Cir. 2005);

*Turnbull v. Topeka State Hosp.,* 255 F.3d 1238, 1244 (10th Cir.

2001); *Weston v. Pennsylvania,* 251 F.3d 420, 427 (3d Cir. 2001);

*Slayton v. Ohio Dep't of Youth Servs.,* 206 F.3d 669, 677 (6th

Cir. 2000); *Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1073-74

(10th Cir. 1998); Rodriguez-Hernandez v. Miranda-Velez,* 132 F.3d

848, 854 (1st Cir. 1998); *Crist v. Focus Homes, Inc.,* 122 F.3d

1107, 1108 (8th Cir. 1997). Courts have also held that an

employer may be found liable for the harassing conduct of

inmates. *See Erickson,* 469 F.3d at 605-06; *Freitag v. Ayers,*

468 F.3d 528, 538-39 (9th Cir. 2006); *Weston, 251 F.3d at 427;*

*Slayton,* 206 F.3d at 677; *see also Garrett v. Dep't of Corr.,*

589 F.Supp.2d 1289, 1297-98 (M.D. Fla. 2007). "Although some

harassment by inmates cannot be reasonably avoided, the

Department, on the other hand, cannot refuse to adopt reasonable

measures to curtail harassment by inmates." *Beckford,* 605 F.3d

at 959.

For liability to attach to the conduct of co-workers or

inmates, Plaintiff must allege that his employer knew or

reasonably should have known about the harassment and failed to

take reasonable remedial action. *Petrosino v. Bell Atlantic*,

385 F.3d 210, 225 (2d Cir. 2004); *Murray v. N.Y. Univ. Coll. of*

*Dentistry,* 57 F.3d 243, 249 (2d Cir. 1995) ("An employer who has notice of a discriminatorily abusive environment in the workplace has a duty to take reasonable steps to eliminate it.").

Plaintiff has pled facts allowing the Court to draw a reasonable inference that Defendant knew of the harassment and failed to take reasonable remedial action. Plaintiff filed two incident reports raising the issue of inmate harassment. Second Amended Complaint ¶¶ 40, 45. After filing the first incident report, Davis was reassigned to a higher security area for inmates. *Id.* ¶ 42. Plaintiff does not state that this reassignment was in response to his complaints of harassment, and for purposes of the 12(b)(6) motion, the Court need not deem that this was a remedial step. In any event, the inmate harassment continued, prompting Davis to file his second incident report. *Id.* ¶ 45-46. Plaintiff alleges that "[n]othing was done to investigate or remediate the inmate harassment" after he filed the second incident report. In addition, Plaintiff alleges that a letter addressing the effects of the harassment was sent from Davis's health center to the Superintendent of the correctional facility. Plaintiff alleges that the inmate harassment continued after this letter was sent.

Defendant argues that Davis should have done more to address the inmate harassment by writing up each inmate for a disciplinary rule violation. Def.'s Reply at 3. Perhaps, but

27

at this stage of the proceedings, Plaintiff has sufficiently
pled facts allowing the reasonable inference that Defendant was
or should have been aware of the hostile work environment and
did not undertake appropriate remedial measures.

Plaintiff's allegations plausibly give rise to an
entitlement for relief. Accordingly, and for the foregoing
reasons, the Court denies Defendant's Motion and Supplemental
Motion to Dismiss counts four and eleven of the Second Amended
Complaint alleging discrimination on the basis of gender
stereotyping in violation of Title VII of the Civil Rights Act
of 1964 and counts one and eight alleging discrimination on the
basis of disability in violation of the Rehabilitation Act and
the VFEPA.

### IV.  Retaliation Claims

Plaintiff brings counts alleging retaliation in violation
of Title VII of the Civil Rights Act, the Rehabilitation Act,
the ADA,[1] and the VFEPA.  To establish a prima facie case of
retaliation, Davis must allege facts that allow the reasonable
inference that (1) he participated in a protected activity, (2)
his employer knew of his participation in the protected
activity, (3) thereafter his employer subjected him to a
materially adverse employment action, and (4) there "was a

---

[1]     As explained above, the Court dismisses Plaintiff's ADA retaliation
claim due to lack of subject matter jurisdiction.

causal connection between the protected activity and the adverse employment action." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552-53 (2d Cir. 2010) (Standard under Title VII); *Weixel v. Bd. Of Educ. Of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002) (Standard under Rehabilitation Act); *Lowell v. IBM*, 955 F.Supp. 300, 304 (D. Vt. 1997) (Standard under the VFEPA).

The parties do not dispute for purposes of the 12(b)(6) motion that Davis's complaint to his union representative about the emails he received from his supervisors in January 2009 is a protected activity. That complaint led to an investigation of Davis's supervisors, so it is also clear that the second part of the prima facie case – that the employer knew of his participation – has also been met.

The parties disagree as to whether Davis was subjected to a materially adverse employment action. Plaintiff must show that a reasonable employee would have found the employment action "materially adverse," meaning that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & S. F. R. Co. v. White,* 548 U.S. 53, 68 (2006). The anti-retaliation provision of Title VII "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 64. It appears on the face of the Second Amended Complaint that incidents connected to Davis's reporting of harassment, both the initial complaint to

the union representative and subsequent incident reports, can

plausibly support a conclusion that they would dissuade a

reasonable worker from making or supporting a charge of

discrimination.

Shortly after the investigation of Davis's supervisors that

was prompted by the complaint to the union representative, Davis

received in his work mailbox the note stating "how's your nuts /

kill yourself / your done."  Second Amended Complaint ¶ 33.

Even though the note was anonymous, the timing and content of

the note certainly would allow a reasonable inference that it

was given to Davis in retaliation for his participation in the

protected activity.

Davis reported the receipt of the note.  In the same

incident report, he complained of continuing harassment by

inmates.  *Id.* ¶¶ 35, 40.  This additional reporting could also

be considered participation in protected activity.  Shortly

after, he was copied on an email between two coworkers that

included a cartoon of someone with a gun to their head with the

caption "kill yourself."  *Id.* ¶ 41.  Moreover, at approximately

the same time, he was assigned to a higher security area for

prisoners, yet the inmate harassment of Davis continued.  *Id.* ¶

42-43.  One may reasonably infer from Plaintiff's alleged facts

that these secluded inmates learned of his medical condition

from Defendant's employees.  *Id.* ¶¶ 44-45.  One may also

reasonably infer that the employees informed the inmates of Davis's condition in order to perpetuate the harassment in retaliation for Davis's reporting of earlier harassment.

Plaintiff's allegations provide a plausible basis for a finding that Defendant's creation and perpetuation of a hostile work environment was itself actionable retaliation. The Second Circuit follows the view that "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action" satisfying the third prong of the retaliation *prima facie* case. *Richardson v. NY Dept. of Correctional Serviced*, 180 F.3d 426, 446 (2d Cir. 1999). "Just as an employer will be liable in negligence for a racially or sexually hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action, so too will an employer be held accountable for allowing retaliatory co-worker harassment to occur if it knows about that harassment but fails to act to stop it." *Id*. Plaintiff has alleged facts supporting a conclusion that Defendant knew about the ongoing harassment and failed to take sufficient remedial measures to stop it. Further, one may readily infer that the retaliatory harassment would dissuade a reasonable worker from making or supporting a charge of discrimination.

Plaintiff also alleges facts sufficient to support an

inference that the foregoing protected activities and the
adverse employment actions were causally connected. The proof of
a causal connection can be established "indirectly by showing
that the protected activity was followed closely by
discriminatory treatment . . ." *De Cintio v. Westchester County
Med. Ctr.,* 821 F.2d 111, 115 (2d Cir. 1987). Plaintiff's facts
support an inference that his co-workers were motivated by
retaliatory animus when they sent messages suggesting he should
kill himself and when they informed secluded inmates in the
higher security area of his medical condition thus opening Davis
to their taunts and ridicule. The messages and the continued
harassment by inmates occurred on the heels of Davis's
participation in protected activity.

The causal link between the protected activities and three
other employment actions are more tenuous. These actions
include the unsupervised "use of force" training, being followed
by a private investigator, and the medical reduction in force.
Each of these could be considered materially adverse employment
actions in that that they could dissuade a reasonable worker
from making or supporting a charge of discrimination. These
actions, however, occurred several months after Plaintiff's
participation in protected activity. Nevertheless, the Second
Circuit "has not drawn a bright line to define the outer limits
beyond which a temporal relationship is too attenuated to

establish a causal relationship. . ." *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001). Because Plaintiff has alleged sufficient facts related to ongoing retaliatory harassment by coworkers to survive the 12(b)(6) motion, he should have the opportunity to develop through discovery the connection between these other materially adverse employment actions and his participation in protected activity.

The Court denies Defendant's Motion and Supplemental Motion to Dismiss counts five, six and twelve of the Second Amended Complaint alleging retaliation under Title VII of the Civil Rights Act of 1964, the Rehabilitation Act and the VFEPA.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendant's Motion to Dismiss and Supplemental Motion to Dismiss.

Dated at Burlington, in the District of Vermont, this 16th day of April, 2012.

/s/William K. Sessions III
William K. Sessions III
U.S. District Court Judge